## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America | Case No. 3:16cr20 (MPS) |
| v. | |
| Anthony Green | November 7, 2016 |

## MEMORANDUM ON RESTITUTION

### I.      Procedural History

On August 23, 2016, the Court sentenced Mr. Green to three years of probation, a fine in the amount of $20,000, and a special assessment of $100.  The Court postponed the determination of restitution until after sentencing under 18 U.S.C. § 3664(d)(5):

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. . . .

The Court asked the parties to file supplemental briefs regarding the restitution owed to the Connecticut Community Bank d/b/a The Greenwich Bank & Trust Company.  The Connecticut Community Bank submitted a Memorandum Regarding Restitution and the Defendant filed a reply.  For the reasons stated below, the Defendant is ordered to pay Connecticut Community Bank restitution in the amount of $163,324.00.

### II.     Factual Background

Mr. Green waived his right to be indicted and pled guilty to a one-count information charging him with embezzlement against a bankruptcy estate on January 29, 2016. (ECF No. 3 at 1.)  The Defendant and the Government stipulated to the following offense conduct in the plea agreement.  From January 1, 2010, through July 1, 2013, the Defendant was a managing member of a limited liability company known as T-Green Carting, LLC ("T-Green").  (*Id.* at 9.)  The

1

Defendant also owned another company known as Strickland Road, LLC.  (*Id.*)  Both companies were garbage collection businesses.  (*Id.*)

On or about February 23, 2010, T-Green owed approximately $534,000 to CIT Small Business Lending Corporation ("CIT"), including outstanding principal and accrued interest.  (*Id.*) On or about March 17, 2010, T-Green borrowed $990,000 from Connecticut Community Bank, N.A., d/b/a The Greenwich Bank & Trust Company ("CCB"), in a commercial loan transaction secured by liens on various properties.  (*Id.*)  Mr. Green signed all of the loan documents on behalf of T-Green. (*Id.*)

The CCB loan included a condition that some of the proceeds be used to pay off the entire loan from CIT.  (*Id.*)  Mr. Green continued to make monthly interest payments to CIT on the remaining loan balance, but fraudulently provided CCB with an altered payoff statement showing a payoff quote of $266,994 for the CIT loan.  (*Id.*)  After the CCB loan closed, Mr. Green continued to make monthly payments to CIT to conceal the existence of the CIT loan and the false nature of the information he had provided to CCB.  (*Id.*)

Mr. Green filed or caused to be filed a voluntary Chapter 11 bankruptcy petition on behalf of T-Green on or about April 12, 2012, in the United States Bankruptcy Court for the District of Connecticut, partly as a result of T-Green's inability to make loan payments on the CCB and CIT loans.  (*Id.*)  T-Green was a bankruptcy debtor and debtor in possession under Title 11, United States Code, Chapter 11.  (*Id.*)  During the period from approximately April 15, 2012, through June 30, 2013, Mr. Green was the sole signatory on the bank accounts of T-Green, he collected or received all of the customer checks made payable to "T-Green Carting, LLC," and he had access to property and documents belonging to the T-Green bankruptcy estate.  (*Id.*)

During that period, though he knew that he was required under the bankruptcy code and rules to deposit all of the customer checks for services performed by the bankruptcy debtor (T-Green) into its debtor in possession bank account ("DIP Account"), Mr. Green deposited some of the checks payable to T-Green into his personal bank accounts.  Mr. Green deposited cash and cash proceeds totaling $169,624 that belonged to the T-Green bankruptcy estate in his personal accounts.  (ECF No. 23 at 4.)  In addition, during the same period, Mr. Green transferred approximately $47,800 from T-Green's DIP Account to his personal bank accounts.  (ECF No. 3 at 10.)  He also transferred approximately $29,100 from his personal accounts to T-Green's DIP Account.  (*Id.*)  Thus, on a net basis, Mr. Green took an additional $18,700 in unauthorized funds from T-Green.  (*Id.*)  Therefore, the total amount embezzled from the bankruptcy estate is $188,324.00.

During the Chapter 11 bankruptcy proceeding, T-Green filed a Motion for Authority to Use Cash Collateral and to Provide Adequate Protection to CCB, which the Bankruptcy Court granted in an order dated March 13, 2013 (the "Order").  (*In re T-Green Carting*, Case No. 12-50689, ECF No. 95.)  On May 14, 2013, T-Green's Chapter 11 bankruptcy was converted to Chapter 7 after T-Green failed to comply with the Order.  (*In re T-Green Carting*, Case No. 12-50689, ECF No. 118.)  On July 14, 2014, after the embezzlement, the Chapter 7 Trustee filed a report of no distribution after determining that there were insufficient funds to administer.  (*In re T-Green Carting*, Case No. 12-50689.)  On July 16, 2014, the Chapter 7 bankruptcy was dismissed without discharge.  (*Id.*)

In the bankruptcy, several entities file proofs of secured claims: CCB for $769,615, CIT for $25,000, Integrated Vehicle Leasing for $65,000, and All Points Capital for $19,802.  (ECF No. 23 at 1.)  Integrated Vehicle Leasing and All Points Capital had debts secured by the vehicles

that they were financing, and both vehicles were abandoned by the estate. (*Id.* at 6.) Both entities sold the vehicles and either were paid in full or have only unsecured claims at this point; in any event, neither entity had a security interest in any of T-Green's assets other than the vehicles. (*Id.*) This left CCB and CIT as the only creditors whose secured claims were not paid off and who would have been entitled to receive the $188,324.00 in cash in a Chapter 7 liquidation.

It is not clear whether CCB or CIT had first priority to T-Green's cash. CIT filed a UCC Financing Statement perfecting its interest in T-Green's assets in May 2007. (*Id.* at 2.) As part of the CCB Loan Agreement, Mr. Green agreed to pay down the CIT loan in full, but he did not do so. (*Id.*) CCB filed a UCC-1 Financing Statement perfecting its security interest on March 20, 2010. (*Id.*) It simultaneously filed a UCC-3 Financing Statement Amendment that terminated CIT's May 2007 Financing Statement. (*Id.*) CIT later filed a Financing Statement Amendment stating that the "UCC Financing Statement Amendment bearing filing no. 0002741779 was filed . . . in error and was not authorized."[1] (*Id.*) CIT filed another UCC-1 Financing Statement on October 17, 2011 claiming "basically all" of T-Green's assets as collateral. (*Id.*) As noted, during the bankruptcy proceeding, T-Green filed a Motion for Authority to Use Cash Collateral and to Provide Adequate Protection to CCB. (*In re T-Green Carting*, Case No. 12-50689, ECF No. 95.) The Bankruptcy Court granted the Motion on March 13, 2013, authorizing T-Green to pay CCB $11,495 per month as protection of its secured interest. (*In re T-Green Carting*, Case No. 12-50689, ECF No. 101.) CIT did not oppose the motion, and T-Green filed no similar motion to protect whatever interest CIT had. In its brief concerning restitution, the Government reports that CIT's counsel confirmed that whatever secured interest CIT had in T-Green's cash is limited to $25,000. (ECF No. 23 at 7.)

---

[1] The Government believes that CIT's filing erroneously misstated CCB's financing statement's filing number.

### III.     Legal Standard

As the parties agreed in the plea agreement, restitution in this case is governed by 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act ("MVRA").  The MVRA provides that a sentencing court "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A. Victim "means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).

"[R]estitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct."  *United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).

### IV.     Discussion

The Defendant makes several arguments why he should not be required to pay significant restitution to the CCB.  First, Defendant points to the fact that T-Green's bankruptcy petition was dismissed without a discharge, and he argues that, as a result, no one was hurt.  Specifically, he argues that CCB – which had a security interest in all of T-Green's cash, among other things (ECF No. 23 at 2-3) – was a secured creditor both before and after the defendant's offense conduct and thus that his conduct did not affect CCB's rights.  Second, he argues that it is too speculative to say what would have happened in the Bankruptcy Court had the embezzlement not occurred.

Finally, he argues that CCB was able to secure additional monies by negotiation with the Defendant and others outside of bankruptcy.  Defendant concedes only that CCB is entitled to the $12,195 in monthly protection payments ordered by the Bankruptcy Court that T-Green failed to make.

The Court has been unable to find cases decided by the Second Circuit specifically addressing how to determine restitution in a case involving embezzlement or other fraud in a bankruptcy.  Nonetheless, the Court finds that the Third Circuit's formula in *United States v. Feldman*, which directs a court the Court to "compare what actually happened with what would have happened if [the defendant] had acted lawfully," 338 F.3d 212, 221 (3d Cir. 2003) (footnote omitted) focuses properly on the statutory causation requirement, 18 U.S.C. § 3663A(a)(2), and the Court will thus rely on it.

Here, what actually happened was that Mr. Green took checks from customers for services provided by the corporate debtor and, instead of depositing them in the DIP Account where they would be available for distribution to creditors, deposited them in his personal account.  He also transferred other funds from the DIP account to his personal account.  The result was that there was $188,324 less in cash available for distribution to creditors.  What would have happened if Mr. Green had acted lawfully is not speculative: CCB and CIT, as the only creditors with security interests in the debtor's cash, would have received the $188,324 in cash that Mr. Green embezzled. The Government has presented some evidence that there was a dispute between CCB and CIT about who had the highest priority in T-Green's cash, in particular whether CIT's $25,000 secured claim had higher priority than CCB's secured claim.  Therefore, the Court cannot conclude by a preponderance of the evidence that CCB is entitled to the full $188,324.00 in restitution.

But the Government has shown by a preponderance of the evidence that CCB is entitled to the remainder – $163,324.00.  Even if CIT's secured claim had higher priority, only CCB was entitled to T-Green's remaining cash.  Mr. Green's argument that it is impossible to know what the bankruptcy judge would have done after the orders requiring three months' protection payments expired misses the point that no one other than CCB had a secured claim to the embezzled cash once CIT's $25,000 claim was satisfied.  That meant that, as long as the debtor wished to continue to use cash to operate its business, the judge was required to continue ordering protection payments to CCB – a point T-Green recognized by filing the Motion for Authority to Use Cash Collateral and Provide Adequate Protection to CCB.  *See* 11 U.S.C. §§ 361 and 363(c)(2).  And, if the debtor had decided instead to fold its tent and enter Chapter 7 (or, as in this case, a creditor sought conversion to Chapter 7), the Chapter 7 trustee would have been required to gather the cash and pay it to CCB.  *See, e.g., In re Bumpass*, 28 B.R. 597, 599 (Bank. Ct. S.D.N.Y. 1983) ("A trustee's goal in a Chapter 7 case is to collect the assets of the estate for liquidation and distribution to the creditors.").

The fact that there was no discharge does not mean that Mr. Green's embezzlement did not cause a loss to CCB, which had the property securing its debt stolen from the bankruptcy estate.  Obviously, CCB was in a better position when the security for its debt was sitting in the debtor's bank account than when it was transferred to a personal bank account and later dissipated, just as a home mortgage lender is in a better position before the homeowner/borrower burns the house down than when all that remains are ashes.  Indeed, this proposition does not depend on the existence of bankruptcy proceedings: as the defendant suggests, CCB had just as much right to the corporate debtor's cash collateral outside of bankruptcy as it did in bankruptcy, and the

embezzlement of that cash by Mr. Green would have hurt it just as much had there been no bankruptcy once it became clear that T-Green could not pay its debt.

The cases cited by Mr. Green do not help his argument. In *United States v. Paradis*, where the defendant "diverted funds he knew were the proceeds of [his boss's] fraud on the bankruptcy court from the bankruptcy estate," thereby "conceal[ing] from the bankruptcy court and from the estate $3 million that could have been available to satisfy claims of creditors," the court rejected the notion that "society alone was the victim", found that "restitution may be appropriate to the extent identifiable victims exist," but determined that, in that case, there was no evidence of harm to creditors, i.e., "no evidence of creditors who filed claims that went unpaid." 219 F.3d 22, 24-25 (1st Cir. 2000). That is not the case here, despite the Defendant's claims in his post-sentencing submission that "the bank is using its role as a victim in this case to try to 'double-dip.'" (ECF No. 30 at 3 n.2.) A review of the agreements submitted shows that, as part of a settlement in 2015, CCB agreed to accept total payments amounting to $928,000, but was originally owed $1,137,928.67 – making CCB's loss over $200,000. (ECF No. 15-5 at 2-4.)

In *United States v. Minter*, the defendant was convicted of bankruptcy fraud after failing to list certain debts in his bankruptcy petition. 146 Fed.Appx. 123 (9th Cir. 2005). The court rejected the Government's argument that, had the debts been listed, the relevant creditors would have received the amounts due them, because that assertion depended on a series of assumptions about what would have happened in the bankruptcy proceedings, including that the debtors would have convinced the bankruptcy court of various arguments, leading to a finding that the debts were not dischargeable. Some of those arguments, the court noted, were not supported by the findings of the jury in the criminal trial. As shown above, however, Mr. Green's case does not involve such a series of "what ifs" on the way to showing that the victim was harmed by his conduct. As the

8

sole holder of a perfected security interest in $163,324.00 of the corporate debtor's cash, CCB stood to lose if that cash was stolen - as it was in this case by Mr. Green – regardless of what happened in the bankruptcy court.

In *U.S. v. Holthaus*, the Government conceded that a defendant who had failed to disclose income and assets in his bankruptcy filing but who did not receive a discharge caused no actual loss to unsecured creditors under the Sentencing Guidelines. 437 F. Supp.2d 932, 936 (N.D. Iowa 2006). To the extent the court's brief discussion of actual loss under the Guidelines should inform this Court's determination of restitution under the MVRA, however, it is plainly distinguishable. The income and assets in *Holthaus* were *concealed*; here, they were *embezzled* from the bankruptcy estate, with the result that there was less cash in the debtor's hands to satisfy creditors. In *Holthaus*, the creditors had the same prospect of recouping their debts after the criminal conduct as they did before, because the income and assets remained available; here, the embezzled funds are gone - and not available to satisfy CCB's debt.

**V.      Conclusion**

For the reasons stated above, the Defendant is ordered to pay Connecticut Community Bank restitution in the amount of $163,324.00. A restitution order with a payment schedule is attached. The Defendant shall make installment payments of $1000 per month for the first year, to begin on January 1, 2017. He shall make installment payments of $1500 per month for the second year. Thereafter, he shall make installment payments of $1300 per month.

The Court adds that, in light of the restitution order, the Court will entertain a modification of the payment schedule for the $20,000 fine, as contemplated in the judgment. Specifically, the Court proposes the following modification to Special Condition Number 3 of the Conditions of Probation: the Defendant shall not be obligated to make any payments towards the fund until two

years after the entry of judgment, after which he will be required to make payments of $200 per month towards the fine.  Under Fed. R. Crim. P. 32.1, the Defendant has a right to a hearing before the Court modifies a condition of probation, although the Rule also states that no hearing is required if "the relief sought is favorable to the person and does not extend the term of probation. . . ."  Fed. R. Crim. P. 32.1(c).  In any event, the Court will hold such a hearing on November 29, 2016 at 1:00pm unless (1) the Defendant files a written statement, signed by the Defendant, waiving his right to any such hearing, and (2) the Government files no objection to the proposed modification with respect to the fine.  If the Defendant files a written waiver and the Government does not object by November 22, 2016, the Court will impose the proposed modification to the fine payment schedule.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
             November 7, 2016